IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
BRENT JACOBY            :
(AIS# 11012126),        :
                        :
     Plaintiff,         :
                        :
vs.                     :        CIVIL ACTION 12-0197-WS-M
                        :
BALDWIN COUNTY, et al., :
                        :
     Defendant.         :
```

REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se
and in forma pauperis filed a Complaint under 42 U.S.C.
§ 1983.  This action was referred to the undersigned
pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule
72.2(c)(4), and is now before the undersigned on the motion
for summary judgment of Defendants, Baldwin County, Major
Arthur L. "Dale" Byrne, Corporal William Crull, Corporal
Kent Carr, Sheriff Huey Mack, Corporal Wallace McCall, Dr.
Charles E. Sherman, Nurse Carla Wasdin (Docs. 27, 31, 43,
44, 45), Plaintiff's opposition thereto, and Plaintiff's
motion for summary judgment.  (Docs. 33, 34, 46, 47).  For
the reasons stated below, it is recommended that the motion
for summary judgment of Defendants Baldwin County, Carr,
Crull, Mack, McCall, Sherman, and Wasdin be granted, that
Plaintiff's motion for summary judgment be denied, and that

Plaintiff's action against these Defendants be dismissed with prejudice.

## I.  SUMMARY OF FACTUAL ALLEGATIONS

From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report and Recommendation.[1]

Plaintiff, Brent Jacoby, is a pre-trial detainee housed at Baldwin County Corrections Center ("BCCC"). (Doc. 44 at 3).  Upon entering BCCC,[2] Jacoby informed officers and the medical staff, through Health Services Request Forms, that he suffered from seizures and mental illnesses that required daily medication. (Doc. 15 at 14-15; Doc. 33 at 2; Doc 47 at 5).  Defendant Dr. Sherman,

_____

[1]    The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, Fla, 208 F.3d 919, 925 n.3 (11th Cir. 2000)(citations and internal quotation marks omitted). Nevertheless, for summary judgment purposes, the Court's analysis begins with a description of the facts in the light most favorable to the nonmoving party. See McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009).

[2]    The exact date of when Plaintiff was booked into BCCC is unclear.  The BCCC intake forms and Defendant Byrne state that Plaintiff has been incarcerated at BCCC since October 27, 2011.  (Doc. 44 at 3; Doc. 44-8 at 2). However, Plaintiff states and the medical records show that Plaintiff's first health services request form was received on October 23, 2011.  (Doc. 27-1 at 12; Doc. 33 at 2). Despite the discrepancy of the booking date, all parties admit that Plaintiff demanded treatment from the beginning of his detention.

first saw Plaintiff on November 1, 2011, and prescribed Dilantin for Plaintiff's seizures and made a notation in the chart to obtain Plaintiff's medical records from the State of New York. (Doc. 27-1 at 49).   Plaintiff continued to make requests for a mental health evaluation, psychiatric medication[3], to have his seizure medicine changed to one of his preference, and to have medication dosages increased. (Id. at 16-22, 26-29, 32, 52; Doc. 43-1 at 2).

On December 12, 2011, Plaintiff cut his throat with a razor blade, then broke the blade in half, wrapped the razor blade pieces in a paper towel, and swallowed the blades.[4]   (Doc. 27-1 at 58; Doc. 45-1).   Plaintiff was taken to the hospital where he received stitches for the

---

[3]    Plaintiff states that at his initial visit, Dr. Sherman informed him that a court order was needed before psychiatric medication could be prescribed, but Defendant Dr. Sherman does not acknowledge making this statement. (Doc. 33 at 2).   Section 3-14 of the Inmate Handbook states that "Mental Health services are provided by resourced outside the Corrections Center.   This is *normally* accomplished at the direction of Judges or at the request of Attorneys.   The Baldwin County Sheriff's Corrections Center Staff will not *normally* make recommendations, nor initiate actions in the area of Mental Health Care."  (Doc. 47-1 at 10) (emphasis added).

[4] The day before the cutting incident, Plaintiff stated on a health services request form, "I don't feel good and every day I am in here I feel like I'm deteriorating and losing my mind.  My behavior is getting worse.  Also, I need to see a psychiatrist and psychologist before I lose it please."  (Doc. 27-1 at 19).

lacerations, a CAT scan that revealed the placement of the razor blades, and was prescribed Lithium, Remeron, and Tegretol.  (Doc. 27-2 at 27-32).

Plaintiff was placed on suicide watch upon returning from the hospital, and the psychiatric medications prescribed at the hospital were continued by Dr. Sherman. (Doc. 27-1 at 50).  Although Plaintiff had been requesting psychiatric medication for over a month and was now receiving it, he often refused to take the medication at pill call or be treated by the medical staff.  (Doc. 27-1 at 21, 60; Doc. 27-2 at 12, 20-21; Doc. 45-1 at 8).  In fact, he threatened to refuse all medical care until he was allowed to see a mental health professional.  (Doc. 27-2 at 12, 20).

On December 22, 2011, while still on suicide watch, Plaintiff obtained another razor blade and, again, cut his throat and wrist, wrapped the broken blade in a paper towel, and swallowed the blade.[5]  (Doc. 27-1 at 60; Doc. 45-

---

[5]    The previous day, Plaintiff demanded to speak to a psychologist.  He stated he was "being punished" and was "not going to deal with [them] much longer."  (Doc. 27-2 at 12).  He refused medical assistance and pills.  He stated he would refuse all medicines until a psychiatrist or psychologist saw him.  (Id.).

Immediately after he cut himself, Plaintiff was taken to the medical department after the cutting incident to receive treatment for his wounds and decontamination from the pepper spray.  (Doc. 27-1 at 60).  The nurse's notes

1 at 10).  Again, Plaintiff received treatment for his self-inflicted wounds and an x-ray was performed to determine the location of the blade inside the Plaintiff. (Doc. 27-2 at 28-29).  The next day, December 23, 2011, it was discovered that Plaintiff's lithium levels were low and Tegretol levels were high, and Dr. Sherman lowered the Tegretol dosage. (Doc. 27-3 at 38).

After being taken off suicide watch, Plaintiff complained of weight gain from the Tegretol and requested that he be prescribed Neurontin.  (Doc. 27-1 at 26).  Dr. Sherman attributed the weight gain to Plaintiff's Remeron prescription, but in attempt to appease Plaintiff, Dr. Sherman discontinued the Tegretol and prescribed Dilantin but also lowered the Remeron in hopes of alleviating the possible side effect of weight gain.  (Doc. 27-1 at 51). On February 8, 2012, when Plaintiff learned that he had once again been prescribed Dilantin instead of Neurontin and that his Remeron dosage had been lowered, he became angry and started yelling at the nurse.  (Doc. 27-1 at 69). He made threats of self-injury and refused to take the prescribed medication.  (Id.).  Based on threats to harm himself and the staff, along with his known history of

---

state that Plaintiff "was laughing and talking to officers" while he was in the medical department.  (Id.).

self-harm when his medications are discontinued, Plaintiff was transferred to suicide watch. (Id.). On February 21, 2012, while still on observation, his seizure medication was changed from Dilantin to Neurontin. (Doc. 27-1 at 52).

On August 19, 2012, an appointment was scheduled with Dr. Sherman after Plaintiff complained of being "unstable mentally," "very emotional," and "losing [his] mind." (Doc. 27-1 at 40). He stated, "I need psychiatric help please." (Id.). On August 20, 2012, at pill call, Plaintiff stated he was "refusing all mental health medications." (Doc. 27-2 at 3). Later that day, Plaintiff cut his neck with a razor blade and claimed to have swallowed it. (Id. at 4). When officers responded, Plaintiff had blood across his chest and neck and yelled that he would cut himself everyday until he was able to speak with Major Byrnes about the "bogus charges" for which he was being held in observation. (Id.). Plaintiff was placed in a restraint chair, but managed to get loose and cut his neck again (creating five superficial wounds that were examined and dressed). (Id. at 5). Plaintiff stated, "[m]an it was a rush with everybody cheering me on." (Id.). After the incident, he was taken to suicide watch, and on his way to F-block he stated, "it's own now;" "it's going to start all over again tomorrow;" "when it comes

out, I'm going to do it again." (Id. at 6).  On August 21,
2012, Plaintiff claimed to have been off of his medication
for five days[6] and cut his wrist and was observed ramming
his head into the bars stating, "I'm tired of this crap.  I
need to see mental health.  I need help." (Id. at 7, 17;
Doc. 27-1 55).  That same day, Nurse Wasdin petitioned the
Probate Court of Baldwin County, Alabama for involuntary
commitment of Plaintiff detailing his previous incidents of
self-harm.  (Doc. 27-3 at 71-72).

Baldwin County Mental Health assessed Plaintiff on
August 27, 2012 and August 31, 2012, for possible
commitment.  (Id. at 64).  It was determined that Plaintiff
was generally stable and did not exhibit any acute
psychotic symptoms.  The mental health professional "felt
that the behaviors reported[, the cutting incidents,] in
the Petition for Commitment [were] primarily reflective of
his personality disorder rather than a serious mental
illness.  Inpatient commitment [was] not recommended at
[that] time.  However, it [was] recommended that Mr. Jacoby
continue to be closely observed as it [was] possible that
he may engage in similar manipulative behaviors in the
future." (Id.).

---

[6] Jacoby stated that he quit taking his medications because
he was mad.  (Doc. 27-1 at 55).

## II.  PROCEDURAL ASPECTS OF THE CASE

Plaintiff filed this § 1983 action on March 19, 2012. (Doc. 1).  His original complaint contained multiple and unrelated claims.  The Court ordered Plaintiff to file an amended complaint alleging only one claim on which he wanted to proceed; the Court specified that any claims that are closely related and/or arise from the same facts, incident, or issue may also be included.  (Doc. 14). Plaintiff filed his amended complaint on July 11, 2012.[7] (Doc. 15).  Plaintiff sued Defendants in their official and individual capacities and demanded injunctive relief ordering Defendants to provide mental health services and housing for inmates, compensatory, nominal, and punitive damages, and requested a trial by jury.  (Doc. 15 at 1, 20).  The Defendants answered Plaintiff's complaint and filed Special Reports for the Court's consideration. (Docs. 27, 31, 43, 44, 45).  Defendants denied each allegation and plead numerous defenses including qualified and absolute immunity.[8]  (Docs. 31, 43).  Plaintiff filed a

---

[7]   Plaintiff's amended complaint alleges five main claims against eight defendants.  The Defendants remained the same in the amended complaint as in the original action, except for Captain Bennett, who was not named as a party in the amended complaint.  (See Doc. 15).

[8] As state officials, Defendants are entitled to absolute immunity from suit for damages in their official capacities.  See Harbert Int'l, Inc. v. James, 157 F.3d

motion for summary judgment (Doc. 46) and responses opposing Defendants' motion for summary judgment (Docs. 33, 47).  These motions are now before the Court.

### III.  SUMMARY JUDGMENT STANDARD

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . .'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)).

The Court must view the evidence produced by "the

---

1271, 1278 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment).

In addition, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  Having found herein that Plaintiff's allegations do not establish a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

nonmoving party, and all factual inferences arising from
it, in the light most favorable to" that party. <u>Barfield v.
Brierton</u>, 883 F.2d 923, 934 (11th Cir. 1989).  However,
Rule 56(e) states that:

> an adverse party [to a motion for summary
> judgment] may not rest upon the mere allegations
> or denials of the adverse party's pleading, but
> the adverse party's response, by affidavits or as
> otherwise provided in this rule, must set forth
> specific facts showing that there is a genuine
> issue for trial. If the adverse party does not so
> respond, summary judgment, if appropriate, shall
> be entered against the adverse party.

Fed. R. Civ. P. 56(e); <u>see also</u> <u>Celotex Corp</u>., 477 U.S. at
325-27.  "[T]here is no issue for trial unless there is
sufficient evidence favoring the nonmoving party for a jury
to return a verdict for that party. . . . If the evidence
is merely colorable, . . . or is not significantly
probative, . . . summary judgment may be granted." <u>Anderson
v. Liberty Lobby, Inc</u>., 477 U.S. 242, 249-50 (1986)
(internal citations omitted). "Summary judgment is mandated
where a party 'fails to make a showing sufficient to
establish the existence of an element essential to that
party's case, and on which that party will bear the burden
of proof at trial.'" <u>Custom Mfg. & Eng'g, Inc. v. Midway
Servs., Inc</u>., 508 F.3d 641, 647 (11th Cir. 2007) (citations
omitted).

<u>IV.  DISCUSSION</u>

10

Plaintiff seeks redress in this action pursuant to 42 U.S.C. § 1983 for an alleged constitutional deprivation under the Fourteenth Amendment[9] for failing to properly treat his psychiatric and seizure conditions, for providing an unsafe suicide watch environment, for unnecessary use of force, retaliation, and unlawful depravation of life, liberty, and property while incarcerated as a pretrial detainee at the Baldwin County Corrections Center. For the reasons set forth blow, the Court finds that Plaintiff's allegations fail to establish any constitutional violation by Defendants.  Thus, it is recommended that Defendants' motion for summary judgment be granted, and Plaintiff's motion for summary judgment be denied.

**A. Inadequate Medical Care Claim.**

"[T]he minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth

---

[9] "[I]t makes no difference whether [the Plaintiff] was a pretrial detainee or a convicted prisoner because 'the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving . . . pretrial detainees.'" Boseman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005) (citations omitted).  See also Danley v. Allen, 540 F.3d 1298, 1306 (11th Cir. 2008) (Pretrial detainees, who are not protected by the Eighth Amendment, can bring the same claims under the Fourteenth Amendment.").

Amendment for a convicted prisoner; both the right to due
process and the right to be free from cruel and unusual
punishment are violated by a government official's
deliberate indifference to serious medical needs."
Lancaster v. Monroe Cnty, Ala., 116 F.3d 1419, 1425 n.6
(11th Cir. 1997).  The Eighth Amendment provides that,
"[e]xcessive bail shall not be required, nor excessive
fines imposed, nor cruel and unusual punishments
inflicted."  U.S. CONST. amend. VIII.  "The Eighth
Amendment's proscription of cruel and unusual punishments
prohibits prison officials from exhibiting deliberate
indifference to prisoners' serious medical needs."
Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999)
(citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

    In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the
Eleventh Circuit delineated the objective and subjective
portions of an Eighth Amendment claim as follows:

>     An Eighth Amendment claim is said to have two
>     components, an objective component, which
>     inquires whether the alleged wrongdoing was
>     objectively harmful enough to establish a
>     constitutional violation, and a subjective
>     component, which inquires whether the officials
>     acted with a sufficiently culpable state of
>     mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S.
1, 8 (1992)).  To meet the objective element required to

demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003).  A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  <u>Id.</u> (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by* <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 n. 9 (2002)).  In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need.  <u>Farrow</u>, 320 F.3d at 1243.  "Deliberate indifference" entails more than mere negligence.  <u>Estelle</u>, 429 U.S. at 106; <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in <u>Farmer</u> by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety*; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added).  In interpreting <u>Farmer</u> and <u>Estelle</u>, this Court explained in <u>McElligott</u> that "deliberate indifference has three

13

components: (1) subjective knowledge of a risk of
serious harm; (2) disregard of that risk; (3) by
conduct that is more than mere negligence."
McElligott, 182 F.3d at 1255; Taylor, 221 F.3d at
1258 (stating that defendant must have subjective
awareness of an "objectively serious need" and
that his response must constitute "an objectively
insufficient response to that need").

Farrow, 320 F.3d at 1245-46.

"Delay in access to medical attention can violate the

Eighth Amendment . . . when it is tantamount to unnecessary

and wanton infliction of pain." Hill, 40 F.3d at 1187

(internal citations and quotation marks omitted). "Cases

stating a constitutional claim for immediate or emergency

medical attention have concerned medical needs that are

obvious even to a layperson because they involve life-

threatening conditions or situations where it is apparent

that delay would detrimentally exacerbate the medical

problem." Id.

The "seriousness" of an inmate's medical needs
also may be decided by reference to the effect of
delay in treatment. Where the delay results in an
inmate's suffering "a life-long handicap or
permanent loss, the medical need is considered
serious." An inmate who complains that delay in
medical treatment rose to a constitutional
violation must place verifying medical evidence
in the record to establish the detrimental effect
of delay in medical treatment to succeed.
Further, we have held that "[t]he tolerable
length of delay in providing medical attention
depends on the nature of the medical need and the
reason for the delay." Consequently, delay in
medical treatment must be interpreted in the
context of the seriousness of the medical need,

14

> deciding whether the delay worsened the medical
> condition, and considering the reason for delay.

Hill, 40 F.3d at 1188-89 (internal citations omitted)
(footnotes omitted).

The Court concedes that a mental illness is an
objectively serious medical need. Therefore, the Court
turns to the subjective element of Plaintiff's claim; that
is, did the defendant have subjective knowledge of a risk
of serious harm to Plaintiff and then disregard that risk,
by conduct that is more than mere negligence.  The Court
will discuss each named defendant in turn.

1.   Defendant Dr. Sherman

Plaintiff claims Defendant Dr. Sherman denied him
psychiatric medical treatment despite knowing that Jacoby
had a history of mental illness. (Doc. 15 at 13).  Courts
have held that inmates are

> entitled to psychological or psychiatric treatment
> if a physician or other health care provider,
> exercising ordinary skill and care at the time of
> observation, concludes with reasonable medical
> certainty (1) that the prisoner's symptoms
> evidence a serious disease or injury; (2) that
> such disease or injury is curable or may be
> substantially alleviated; and (3) that the
> potential for harm to the prisoner by reason of
> delay or the denial of care would be substantial.
> The right to treatment is, of course, limited to
> that which may be provided upon a reasonable cost
> and time basis and the essential test is one of
> medical necessity and not simply that which may be
> considered merely desirable. . . . Along with all
> other aspects of health care, this remains a

15

question of sound professional judgment. The
courts will not intervene upon allegations of mere
negligence, mistake or difference of opinion.
<u>Russell v. Sheffer</u>, 528 F.2d 318, 319 (4th Cir.
1975); <u>Thomas v. Pate</u>, 493 F.2d 151, 158 (7th
Cir.), *cert. denied sub nom.*, <u>Thomas v. Cannon</u>,
419 U.S. 879, 42 L. Ed. 2d 119, 95 S. Ct. 143
(1974); <u>Jones v. Lockhart</u>, 484 F.2d 1192, 1194
(8th Cir. 1973); <u>Corby v. Conboy</u>, 457 F.2d 251,
254 (2nd Cir. 1972). For a constitutional tort to
arise and for a cause of action to be stated under
§ 1983, the complainant must allege deliberate
indifference to his continued health and well-
being.

<u>Bowring v. Godwin</u>, 551 F.2d 44, 47-48 (4th Cir. 1977).

When Defendant Dr. Sherman first assessed Jacoby on
November 1, 2011, Jacoby stated he had a history of mental
illness, but he did not present with any acute psychotic
symptoms or depressive thoughts; with symptoms of mental
illness lacking, Dr. Sherman had no subjective knowledge
that Jacoby was at a substantial or immediate risk for harm
due to psychological problems.  (Doc. 27-1 at 49).
Furthermore, unlike being in the free world, Plaintiff was
in a secured and restricted environment that lessened the
"potential for harm to the prisoner by reason of delay" in
providing psychiatric drugs.  <u>Russell</u>, 528 F.2d at 319.
Dr. Sherman did, however, promptly act to get copies of
Jacoby's past medical records for review of his purported
mental health issues.  (Doc. 27-1 at 49).  Failing to
prescribe psychiatric medicines to Jacoby at his initial

16

doctor's appointment can be viewed as no more than possible negligence at worst. Furthermore, there are no indications from incident reports from officers, other inmates, or medical staff that Jacoby ever exhibited psychotic features or episodes at BCCC prior to December 12, 2011, when he first cut himself with a razor blade and swallowed it. While Plaintiff did submit several requests for a mental health evaluation and medication, without outward signs of mania, depression, or psychosis, the Court finds it impossible to say that Defendant Dr. Sherman knew of "an excessive risk" to Plaintiff's health or safety and disregarded it. Farmer, 511 U.S. at 837.   After Plaintiff cut himself on December 12, 2011, Dr. Sherman had knowledge of Plaintiff's medical need and treated Plaintiff accordingly. [10]   From that day forward, Dr. Sherman prescribed psychiatric medication for Plaintiff and monitored his blood levels to ensure the right dosages.

     As to any claim that Plaintiff may assert against Defendant Dr. Sherman for a delay in medical treatment,

---

[10] Plaintiff cites Waldrop v. Evans, 871 F.2d 1030 (11th Cir. 1989) as support for his claim.  Waldrop, however, challenged the lack of response to the inmate's needs. That is easily distinguishable from this action where Defendants responded to Jacoby.  Jacoby was taken to the hospital each time it was needed, he was prescribed medication and had dosages monitored, and he was placed on suicide watches and observed each time his behavior warranted it or he threatened self-harm.

Plaintiff's claim would also fail for lack of evidence.
The delay in Plaintiff's receipt of psychiatric medication
did not result in "a life-long handicap or permanent loss."
Hill, 40 F.3d at 1188.  An inmate who complains that delay
in medical treatment rose to a constitutional violation
must place verifying medical evidence in the record to
establish the detrimental effect of delay in medical
treatment to succeed.  Id.  The evidence in this action
actually proves there was no detrimental effect due to any
possible delay.  Specifically, when Plaintiff was examined
by Baldwin County Mental Health, three days after cutting
himself twice in 48 hours, it was determined that he
possessed no acute psychotic symptoms, did not need to be
committed for psychiatric evaluation or treatment, and it
was determined that his behaviors of cutting himself were
"primarily reflective of his personality disorder rather
than a serious mental illness." (Doc. 27-3 at 64).  Thus,
the nine-month delay in obtaining his requested mental
health evaluation had no detrimental effect because no
diagnosis, medication, or treatment plan changed for
Plaintiff.  Based on the mental health professional's
opinion, Plaintiff was receiving any needed medication from
the jail, and his "manipulative behaviors [may continue] in
the future" based on his personality disorder.  (Doc. 27-2

at 64).  There does not appear to be any treatment or
provision that Dr. Sherman (or any of the other Defendants,
for that matter) could have taken or should have taken that
would have alleviated or extinguished Plaintiff's
propensity for cutting himself and swallowing the blades,
since by all accounts these acts were to manipulate others
into acquiescing to his requests rather than being due to a
serious medical illness.  (Id.).  Therefore, Plaintiff has
not carried his burden of proving that any delay in
receiving psychiatric treatment constituted a violation of
his rights under the Fourteenth or Eighth Amendment.

Plaintiff also claims Defendant Dr. Sherman denied him
adequate medical care by failing to prescribe proper
seizure medication.  (Doc. 15 at 14).  The Court finds no
evidence of this claim.  The record shows that at
Plaintiff's initial appointment with Dr. Sherman, he was
prescribed medication to obviate any possible epileptic
episode since a single episode could be life threatening.
(Doc. 27-1 at 49).  As the physician, Dr. Sherman used his
professional judgment in determining that Dilantin was a
more appropriate medicine to prescribe since it was
indicated for grand mal seizures, the type of seizure from
which Plaintiff suffered.  (Doc. 27 at 2).  The fact that
Plaintiff requested the drug Neurontin, but was prescribed

Dilantin does not suggest that Defendant Dr. Sherman was
deliberately indifferent to Plaintiff.  Furthermore,
Plaintiff has not experienced a single seizure while being
under Dr. Sherman's care, and Dr. Sherman has continued to
respond to every complaint and concern of Plaintiff
regarding his seizure medications, has even changed
Jacoby's prescription at least three times, and adjusted
the dosages based on blood levels and Plaintiff's
subjective opinions. The mere fact that Plaintiff may
disagree with the efficacy of the treatment recommended or
simply prefer a different course of treatment does not
state a valid claim of medical mistreatment under the
Eighth Amendment.  See Adams v. Poag, 61 F.3d 1537, 1545
(11th Cir. 1995); Harris v. Thigpen, 941 F.2d 1495, 1505
(11th Cir. 1991) (explaining that a difference in medical
opinion between the prison's medical staff and the inmate
about the inmate's course of treatment will not support a
claim of cruel and unusual punishment). "When a prison
inmate has received medical care, courts hesitate to find
an Eighth Amendment violation." Waldrop v. Evans, 871 F.2d
1030, 1035 (11th Cir. 1989).

Plaintiff fails to state a valid claim against
Defendant Dr. Sherman for violating his Eighth Amendment
rights by putting him "in segregated suicide watch until

20

pills were taken." (Doc. 15 at 14). There is no evidence
in the record, that Dr. Sherman had any responsibility for
Plaintiff being put on observation on February 8, 2012.[11]

The Court finds Plaintiff has failed to carry his
burden of proving Defendant Dr. Sherman acted with
deliberate indifference, and all claims against Defendant
Sherman should be dismissed and summary judgment for
Defendant Dr. Sherman should be granted.

2.   Defendant Nurse Wasdin

Plaintiff claims Defendant Nurse Wasdin is responsible
for denying and/or delaying him medical treatment for 45
days.  Upon receipt of the first health services request
form filed by Plaintiff, Nurse Wasdin attempted to locate
medical and pharmaceutical records of Plaintiff in attempt
to confirm Plaintiff's stated diagnoses.[12]  When she was

---

[11] Even if Dr. Sherman had taken part in ordering Plaintiff
to suicide watch on February 8, 2012, Plaintiff's claim
would still fail.  See infra pp. 44-47 for discussion of
retaliation claim against Defendants.

[12] His first health services request form detailed the
previous medicines he had been prescribed to treat his
bipolar disorder, post-traumatic stress syndrome, anxiety
disorder, and antisocial personality disorder, as well as,
treating physician's name and pharmacy used.  (See Doc. 27-
1 at 12).  However, the doctor and pharmacy named could not
be located, and Plaintiff was informed that without
verification of the prescriptions listed, he would have to
wait for an appointment with Dr. Sherman before being
administered any medications.  (Id.).  Plaintiff responded
by giving the name of two more pharmacies, one of which did
have medications on file for Plaintiff, but they were

unable to verify his reported conditions and medications,
she scheduled an appointment for Plaintiff to see the
doctor.  When Plaintiff was examined by the doctor he was
prescribed seizure medicine and, thereafter, psychiatric
medications.  Given that it is beyond Nurse Wasdin's
authority to prescribe medicine to Plaintiff, there is
nothing more that she could do for him besides refer him to
the physician, which she did each time Plaintiff requested
it.  There is no evidence in the record that Defendant
Nurse Wasdin knew of "an excessive risk" to Plaintiff's
health or safety and disregarded it. Farmer, 511 U.S. at
837.

Plaintiff claims Defendant Nurse Wasdin told him that
BCCC does not provide mental health care without a court
order, and Nurse Wasdin denies making this statement.
(Doc. 44-5 at 10; Doc. 15 at 12).  Despite this
inconsistency, Nurse Wasdin was the person responsible for
petitioning the court to have Plaintiff involuntarily
committed on August 21, 2012.  (Doc. 27-3 at 71-72).

---

different from the ones Plaintiff named and the medicines
were last filled in January and February of 2010. (Id. at
57).  BCCC obtained a signed release for health information
from Plaintiff in order to get a copy of his medical
records from New York, and, thereafter, Plaintiff was
scheduled for an appointment with Dr. Sherman.  (Id. at 13-
15).

Again, this was a proactive step taken to protect Plaintiff
and is the exact opposite of showing deliberate
indifference.  Furthermore, any claim that Plaintiff may
assert for delay in mental health care against Defendant
Nurse Wasdin fails for the same reasons as those against
Defendant Dr. Sherman discussed above.

Plaintiff also asserts that Defendant Nurse Wasdin
violated his constitutional rights because she was
partially responsible for determining when he was released
from suicide watch despite lacking psychiatric training.
(Doc. 15 at 12-12).  Again, deliberate indifference is the
standard Plaintiff must prove, and the Court finds none.
Nurse Wasdin provides the "medical opinion on which housing
category best suits an inmate." (Doc. 44-5 at 8).  She
bases her opinion on an inmate's answers to "medical-based
questions." (Id.).  While it is unclear from the record
what formal training Nurse Wasdin may or may not have in
psychiatric care, she has been a Registered Nurse since
1982 and a Certified Corrections Nurse since 1984. (Id. at
1).  With almost 30 years of nursing experience in
correctional institutions, the Court finds it far-fetched
to argue that she lacks experience in determining which
inmates are psychologically disturbed, depressed, anxious,
suicidal, or psychotic - even laymen can distinguish

23

between someone who behaves within societal norms and
someone who is manic, psychotic, or voicing threats of
self-harm.  Furthermore, Nurse Wasdin had first-hand
knowledge of and experience with Plaintiff.  She
corresponded with him and treated him from the beginning of
his incarceration at BCCC; she would surely know his
personality and what is normal behavior or not for
Plaintiff.

Plaintiff complains that he could "go weeks with no
problems but would be denied to come off" suicide watch
based partially on Nurse Wasdin's opinion.  (Doc. 15 at
13).  It appears from a review of the record, that as soon
as Plaintiff felt better and completed a successful week of
15-minute observation, he believed he should be released
entirely from suicide watch and not have to complete
another week in 30-minute observation.[13]  Defendant Nurse

---

[13] Plaintiff was first placed on suicide watch on December
13, 2011 after returning from the hospital after his first
cutting incident.  (Doc. 27-2 at 32).  While on watch, he
often refused to take his medicine, refused medical care
for the cleaning of his wounds, yelled and cussed at nurses
and officers.  (Doc. 27-1 at 20, 50; Doc. 27-2 at 11-12,
20-21; Doc. 45-1 at 8).  Plaintiff became angry when he was
not released from suicide watch after his first week, so
"Jacboy got a razor while in suicide watch passed to him
and attempted suicide later that night."  (Doc. 47 at 8;
Doc. 27-1 at 20; Doc. 27-2 at 12; Doc. 45-1 at 10-11).
Once Nurse Wasdin opined that the medicines were working
and Plaintiff had a "good attitude, laughing, explained
depression," Nurse Wasdin followed protocol and recommended

Wasdin, however, has followed BCCC protocol and continued Plaintiff on 30-minute observation after he successfully completed a week of 15-minute observation.  Acting out of an abundance of caution and following suicide watch policies can hardly be considered acting deliberately indifferent towards Plaintiff.  In fact, the Court would be more inclined to find liability on the part of Defendant Nurse Wasdin if she had released Plaintiff after only one week of good behavior and no self-harm or threats of self-harm.  While Nurse Wasdin admittedly is not a psychologist or psychiatrist, she does have medical experience enough to distinguish if someone appears to be a harm to oneself.  Therefore, Plaintiff's claim that Defendant Nurse Wasdin was deliberately indifferent to his mental needs due to leaving him on suicide watch fails as a matter of law.

3.   Defendants Corporal McCall and Corporal Carr

Classification officers and the Director of Nursing interview inmates on observation weekly to determine what level of housing is most suitable," and when both the officer and nurse "agree that the inmate is ready to come

---

Plaintiff be taken off 15-minute observation and placed on 30-minute observation.  (Doc. 27-2 at 14).  Plaintiff was released from suicide watch on January 10, 2012.  (Doc. 44-5 at 11).  Plaintiff was again taken to 15-minute suicide watch on February 8, 2012, was reduced to 30-minute observation on February 15, 2012, and was released from observation on February 22, 2012.  (Id. at 12).

off 15-minute observation, then the inmate is housed on 30-minute observation for at least one week before returning to general population." (Doc. 44-4 at 9).  Plaintiff's claim against classification officers, Defendants McCall and Carr, centers on the fact that they lack psychiatric training and, therefore, should not have been responsible for determining his length of stay on suicide watch. However, the record proves that these officers do not make any judgment calls or diagnoses of Plaintiff's mental health; rather, the classification officers observe an inmate's conduct based on maintaining an "orderly and secure" jail and Nurse Wasdin makes the medical determinations.  (Doc. 44-5 at 7-8; Doc. 44-1 at 8, 12; Doc. 44-4 at 8-9).  Consequently, it is irrelevant whether or not Defendants McCall and Carr have any psychiatric training.  Based on the forgoing, Plaintiff has failed to state a viable claim against Defendants McCall and Carr.

4.      Sheriff Mack and Major Byrne

     Plaintiff claims that Defendants Sheriff Mack and Major Byrne violated his constitutional rights when they "deprived [him] of psychiatric care, medications, and counseling" from October 23, 2011 through July 7, 2012, "because it was [their] policy to not hire any Mental Health employees such as psychiatrist[s], psychologist[s],

26

and social worker[s]."[14]  (Doc. 15 at 11).  In order to
state a claim upon which relief can be granted in a § 1983
action, Plaintiff must establish a causal connection
between each defendant's actions, orders, customs,
policies, or breaches of statutory duty and the alleged
deprivation of his constitutional rights. See <u>Frankum v.</u>
<u>Chapman</u>, 2009 WL 1118875, *3 (S.D. Ala. 2009); <u>Trotter v.</u>
<u>Correctional Medical Services, Inc.</u>, 2008 WL 2225696, *9
(S.D. Ala. 2008). Liability for an alleged constitutional
violation cannot be established on the basis of a theory of
*respondeat superior*. <u>See</u> <u>Edwards v. Alabama Dep't of</u>
<u>Corrs.</u>, 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A
theory of *respondeat superior* is not sufficient to support
their § 1983 claim. . . ."). "[S]upervisory liability
under § 1983 occurs either when the supervisor personally
participates in the alleged unconstitutional conduct or
when there is a causal connection between the actions of a
supervising official and the alleged constitutional
deprivation." <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1360 (11th

---

[14] Given that Plaintiff seeks injunctive relief in this
action, it is worth noting that BCCC appears to have
contracted with Ms. Kathleen Sellers, to provide
psychiatric counseling to inmates since December 1, 2012,
until November 30, 2013.  <u>See</u> Baldwin County Commission
Agenda Form,
http://openmeetings.baldwincountyal.gov/sirepub/agdocs.aspx
?doctype=agenda&itemid=530542 (last visited April 16,
2013).

Cir. 2003). "The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Id. (citations omitted). "Alternatively, the causal connection may be established when a supervisor's 'custom or policy . . . result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" Id. (citations and internal quotation marks omitted).  In such instances, Plaintiff must show that the policy or custom was "the 'moving force [behind] the constitutional violation.'"  Pinkney v. Davis, 952 F. Supp. 1561, 1569 (M.D. Ala. 1997) (citations omitted).  "[I]t is clear that not only must there be some degree of 'fault' on the part of [defendant] in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation." Id. (citations omitted).

Plaintiff has not alleged that Defendants Mack or Byrne personally participated in any of the events involving Jacoby and in his response to Defendants' motion for summary judgment, he does not cite any evidence of

widespread and obvious denial of mental health care to inmates.[15]  In fact, the record reflects that Plaintiff did receive mental health care even though it was not what he desired or provided as quickly as he demanded. (Doc. 27-1 at 25, 50, 51, 54, 58-59, 71; Doc. 27-2 at 32, 40; Doc. 27-3 at 38, 42).  Thus, there can be no causal connection between Defendants Mack and Byrne to any constitutional violation.  While Defendants Sheriff Mack and Major Byrne admit that BCCC did not have a psychiatric specialist on staff at the jail, they contend that if Dr. Sherman had determined that Plaintiff needed to be seen by a mental health professional, he "would have been transported to and examined by a psychologist or a psychiatrist" just as he was taken to the hospital each time he cut himself and was provided x-rays for his safety (Doc. 44 at 19).  There is no evidence before the Court of any policy of Defendants that denied Plaintiff or other inmates of psychiatric or medical care, and the Court finds no deliberate indifference to Plaintiff's mental health needs.  For these

---

[15] Plaintiff also asserts that when he was booked into Baldwin County Jail he had medications on his person and it was BCCC's policy to take all medications from incoming inmates and detox them.  (Doc. 15 at 4).  This accusation is not supported by the record.  Defendant Byrne avers that there is no such policy at BCCC (Doc. 44-6 at 17), and the Property Inventory Sheet from Plaintiff's booking does not list any medications (Doc. 44-8 at 16).

reasons, Plaintiff fails to state a claim against
Defendants Mack and Byrne for inadequate psychiatric care
policies.

5.        Baldwin County

Plaintiff claims that Baldwin County is liable for
constitutional violations due to inadequate psychiatric
care policies in place.  (Doc. 15 at 11).  "[A]
municipality can be liable under § 1983 only where its
policies are the moving force behind the constitutional
violation." City of Canton, Ohio v. Harris, 489 U.S. 378,
388-89 (1989).  To impose § 1983 liability on a
municipality, a plaintiff must show the following: (1) that
his constitutional rights were violated; (2) a custom or
policy that constituted deliberate indifference to those
rights; and (3) a causal link between the custom or policy
and the violation. See McDowell v. Brown, 392 F.3d 1283,
1289 (11th Cir. 2004).

The Court having concluded as a matter of law there
was no deliberate indifference concerning the mental health
care Plaintiff received, there can be no municipal
liability on that theory, and this cause of action must
fail.  See Greek v. Clayton Cnty, Ga., 335 F.3d 1326, 1329
(11th Cir. 2003)(municipal liability under § 1983 exists

only when county's official policy "causes a constitutional violation").

**B. Unsafe Suicide Watch Environment Claim.**

Plaintiff alleges that Defendants Baldwin County, Sheriff Mack, and Major Byrne have violated his constitutional rights by maintaining an unsafe suicide watch environment at BCCC. (Doc. 15 at 15-17). He supports this claim by presenting facts that while on suicide watch he was housed in F-block with non-suicidal inmates, that he obtained two homemade knives and two razor blades, and harmed himself twice while on watch. (Id.).

As stated previously, a prison official is liable for a § 1983 action only when he is deliberately indifferent to a substantial risk of serious harm to an inmate. In the context of a suicidal inmate, the Eleventh Circuit has established "deliberate indifference" to be when officers "directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide" and they fail "to take steps to prevent that inmate from committing suicide." Greason v. Kemp, 891 F.2d 829, 856-57 (11th Cir, 1990). However, there is no deliberate indifference "unless there was a 'strong likelihood, rather than a mere possibility, that suicide would result from a defendant's actions or inaction.'" Heggs v. Grant, 73 F.3d

317, 320 (11th Cir. 1996).  Liability will be found only if the officer "knows of and disregards an *excessive* risk to the inmate's health or safety."  Farmer, 511 U.S. at 837 (emphasis added).  Deliberate indifference is more than negligence, or even gross negligence; "[i]t is only such indifference that can offend 'evolving standards of decency' violation of the Eighth Amendment."  Estelle, 429 U.S. at 106 (quoting Gregg v. Georgia, 428 U.S. 153, 182-83 (1976).

1.   Defendants Sheriff Mack and Major Byrne

     As to Defendants Mack and Byrne, Plaintiff claims they are responsible for housing him in "an unsafe suicide watch environment" and "failing to protect him from harm.  (Doc. 15 at 17).  He states that non-suicidal inmates housed in F-block "gave [him] razors and other pieces of steel to harm himself and others."  (Id.).  The question before the Court is did Defendants Mack and Byrne act deliberately indifferent to Plaintiff by housing Jacoby in F-block while on suicide watch?  The Court finds that Defendants were not deliberately indifferent for the following reasons.

      Suicide watch at BCCC consists of transferring at risk inmates to one of the three center cells of F-block. Doc. 44-6 at 14).  F-Block houses inmates in "protective custody, administrative segregation, disciplinary

32

segregation, suicide watch, and general watch.  (Id. at

15).  The three center cells used for suicide watch

"contain cameras which feed constant images of the inmates

to the officers stationed in the control pod."  (Id.).  At

risk inmates are also physically observed every 15-minutes

by an officer who checks for contraband and "takes a

picture of the inmate and documents the inmate's activity

on a Corrections Center Form."  (Id.).  Inmates are given a

suicide gown to wear and a sleeping mat, and all other

personal property is withheld to protect the inmate from

potential self-harm.  (Id.).  Once the classification

officer and nurse agree that inmate may be moved to 30-

minute observation, the inmate is given a BCCC uniform,

issued a regular sleeping mat and bedding materials, and

receives his personal property back.  (Id. at 15).

> No inmate housed in F block is issued a razor.
> However, inmates housed in E block are issued
> razors for a set amount of time three days a week
> in order to shave.  The door from F block to E
> block is separated by a hallway.  E and F inmates
> can slide a note or razor blade from block to
> block by pushing the object with force across the
> hallway and under the cell block door.  While
> Corrections Officers are continually observing
> this area, occasionally contraband is passed this
> way.[16]

---

[16] Plaintiff confirms "contraband and non contraband items"
are obtained by using fishing line to pass items through
the connecting door from E-Block to F-Block or "during your
shower time/inside recreation."  (Doc. 47 at 6-7).

(Id.).  To avoid liability for deliberate indifference,
BCCC officials must impose a reasonable duty to protect
inmates once they become aware of a threat to an inmate's
health and safety.  Hopkins v. Britton, 742 F.2d 1308, 1310
(11th Cir. 1984); Gullatte v. Potts, 654 F.2d 1007, 1012
(5th Cir. 1981).  Any negligent failure to protect inmate
does not justify liability under section 1983. Davidson v.
Cannon, 474 U.S. 344, 347-48 (1986).

In this action, Defendants took reasonable precautions
to protect inmates, including Jacoby.  Given that
Defendants are aware of the potential for access to
dangerous contraband through the connecting door of F-block
and E-block, they monitor the area and watch closely for
items being passed back and forth.  (Id.).  It should be
noted that Plaintiff obtained contraband not by the known
method of the connecting blocks' door but through other
means not known or obvious to Defendants at the time.
(Doc. 47-6-7).  Specifically, after Jacoby became angry
about remaining on suicide watch for another week, he
traded food for a razor and a homemade razor "from a couple
[of] inmates when everyone started coming out for
recreation" and cut his neck and wrist. [17]  (Doc. 15 at 7-

---

[17] While receiving medical attention after cutting himself,
Plaintiff stated, "You know 3 sandwiches will buy you

8).   Officers promptly intervened and responded by using
pepper spray on Plaintiff to prevent him from inflicting
any further self-harm, and Plaintiff was taken directly to
the medical unit and decontaminated and then taken to the
hospital for any needed treatment of his wounds.   (Doc. 44-
6 at 16).   Following this incident, Jacoby was continued on
15-minute observation, placed in cell by himself, given a
suicide gown and matt only, provided sack meals and any
left over food was to be removed after 20-30 minutes, his
cell was to be searched at each shift for any potentially
harmful items, and he was not to be let out of his cell.
(Doc. 27-1 at 61).

Evidence shows that Plaintiff had a history of hiding
food and medications in his cell so he could trade them for
contraband items.   When BCCC staff became aware of this,
they changed his pill call status and put him on medical
watch for all his doses, ordered that his medicines be
crushed so they could not be saved and potentially traded,
and ordered restricted meal-time procedures so that his
left-over food was accounted for and could not be kept in
his cell for trading.   (Doc. 45-1 at 16; Doc. 27-1 at 39;

---

anything.   Y'all really shouldn't have suicide watches in
with reg[ular] population."   (Doc. 27-1 at 60).   The Court
infers from this remark that Plaintiff obtain the razor
blade used to cut himself while housed in suicide watch by
saving and trading his food for contraband.

58, 60; Doc. 27-2 at 2).  Defendants' actions prove that they were not deliberately indifferent to Plaintiff but imposed reasonable limitations to protect Jacoby each time there was any known risk posed.  Hopkins, 742 F.2d at 1310.

Again, on August 21, 2012, while Plaintiff was on suicide watch, he obtained a razor blade and cut his wrist. (Doc. 27-2 at 7).  After this incident, Nurse Wasdin petitioned the court for involuntary commitment of Plaintiff to a mental facility.  (Doc. 27-2 at 71-72).

All evidence presented by the parties proves that each time Defendants became aware that Plaintiff was obtaining contraband or dangerous items while on suicide watch, they acted immediately to protect Plaintiff.  Defendants housed Plaintiff in the most observable area of the jail with 24-hour video surveillance and adequate physical monitoring. Although the surrounding area of Plaintiff's suicide cell housed non-suicidal inmates, there is no evidence before the Court that this alone equates to deliberate indifference.  There is no evidence that Defendants ever knew of an excessive risk to Plaintiff's safety and disregarded it.  There is no evidence that Defendants never knew Plaintiff had any harmful instrument in his possession and thought he would cut himself.  There can be no liability on the part of Defendants for failing to stop all

36

contraband from reaching the hands of Plaintiff; it is unfeasible and unreasonable.  There can only be liability if Defendants knew of an excessive risk and disregarded it by failing to take reasonable measures to abate it, and there are no facts that lead the Court to this conclusion. Farmer, 511 at 847.  "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.  "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." Gish v. Thomas, 516 F.3d 952, 954 (11th Cir. 2008) (quoting Tittle v. Jefferson Cnty. Comm'n, 10 F.3d 1535, 1540 (11th Cir. 1994) (en banc)).

Furthermore, Plaintiff complains of incidents unique to him, not of a vast problem with inmates on suicide watch consistently obtaining dangerous tools or of frequent suicides committed at BCCC, and not to belittle Plaintiff's acts of self-mutilation, but to credit Defendants, Plaintiff has not been successful at committing suicide despite cutting himself and threatening to harm himself numerous times.  Thus, Plaintiff has failed to carry his

burden of proving a constitutional violation and this claim should be dismissed.

2.   Defendant Baldwin County

Finding no constitutional violation by any government employee or defendant, Defendant Baldwin County cannot be found liable either, and the claim against it should be dismissed.

**C. Unnecessary Use of Force Claim.**

Plaintiff claims that Defendant Corporal Crull unnecessarily used excessive force against him on two separate occasions, December 15, 2011, and December 22, 2011. In order to establish an Eighth Amendment claim, a plaintiff must prove both an objective and subjective component.  First, Plaintiff must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation, and, second, Plaintiff must show that "the officials act[ed] with a sufficiently culpable state of mind," *i.e.*, that they acted "maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6-8 (1992).

"Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'"  Skrtich v.

Thornton, 280 F.3d 1295, 1300 (11ᵗʰ Cir. 2002) (quoting
Whitley v. Albers, 475 U.S. 312, 320-21 (1986)).  The
factors used to determine whether there has been a
violation of the Eighth Amendment in the prison security
context are: the need for the application of force, the
relationship between that need and the amount of force
used, the threat reasonably perceived, any efforts to
temper the severity of a forceful response, and the extent
of injury suffered.  Hudson, 503 U.S. at 7 (citing Whitley,
475 U.S. at 321).

The courts recognize that corrections officials often
must make decisions "'in haste, under pressure, and
frequently without the luxury of a second chance.'"
Hudson, 503 U.S. at 6 (citing Whitley, 475 U.S. at 320).
Moreover, an inmate "is not at liberty to ignore or
disobey, without consequence, the lawful orders of his
custodians or the rules and regulations of a jail." West
v. Sconyers, 2010 WL 4822084, *7 (M.D. Ala. 2010)
(unpublished).  "Strict adherence to rules and orders
within a penal institution's walls are necessary for
discipline, and even more importantly, for the safety and
security of inmates, guards, and visitors alike."  Id.
However, "government officials may not use gratuitous force
against a prisoner who has been already subdued or . . .

incapacitated." Skrtich, 280 F.3d at 1303 (citations
omitted). "The use of force must stop when the need for it
to maintain or restore discipline no longer exists." Id.
at 1304 (citations omitted).

The Court finds no record of any incident occurring on
December 15, 2011, as stated by Plaintiff. However, there
is an activity report dated December 14, 2011, that appears
to detail the incident alleged by Plaintiff. Defendant
Corporal Crull states that on December 14, 2011, Jacoby
resisted medical staff at pill call when he "refused to
take the pill and started yelling and cussing at the nurse
and [Crull] . . . and [Jacoby] hit[] the slider on the
door." (Doc. 45-1 at 8). Crull ordered Plaintiff to
return the medication to the nurse if he was not going to
take it and Plaintiff refused. (Doc. 44-2 at 9).
Defendant Corporal Crull called a code yellow and officers
responded, and Jacoby was placed in a restraint chair.
(Id.; Doc. 45-1 at 8). On the other hand, Plaintiff claims
he had no clean, running water and was being "forced to
drink out of a toilet to quench his thirst and take his
pills as well as defecate and urinate in the sink so he
wouldn't dirty up his water in his toilet." (Doc. 15 at
6). For this reason, Plaintiff claims he was holding "his
pills as a hostage for water when Corp. Crull and a nurse

40

came around on or about 12-15-11.  Corp. Crull then came back with some officers because Jacoby was being put in the restraint chair for yelling about water," and while restrained Defendant Crull berated him and denied him water to drink.[18]  (Id. at 6).

Taking the Plaintiff's facts as true, there is no constitutional violation stated.  Placing Plaintiff in a restraint chair and even denying him water for a period of time is not objectively "harmful enough" to establish a constitutional violation. Hudson, 503 U.S. at 6.  By both Plaintiff's and Defendant's accounts, the force used was applied to "maintain or restore discipline [and not] maliciously and sadistically to cause harm."  Skrtich, 280 F.3d at 1300.  Force was necessary to calm Plaintiff down from "screaming" and "yelling." (Doc. 15 at 6).  Based on Plaintiff's propensity to cut himself and make threats to harm staff, officers had reason to question Plaintiff's mental state and be unsure of his intentions.  The force

---

[18] Defendant Crull states the only time he recalls Plaintiff being without running water was when Plaintiff "used his blanket to stop up the toilet." (Doc. 44-2 at 8).  This apparently caused the water supply to Plaintiff's sink to shut off, but as soon as this was realized, "[t]he toilet and sink were returned to working order promptly." (Id.).  Furthermore, Defendant Crull alleges providing Plaintiff with two cups of drinking water while he was confined in the restraint chair. (Doc. 44-2 at 8).

used, the restraint chair, was reasonable for the situation.  The only injury Plaintiff complains of is his denial of water.  (Id.).  Having a drink of water withheld for a short length of time can hardly be considered cruel and unusual. The Court finds there was no constitutional violation by Defendant Corporal Crull on December 14, 2011 or December 15, 2011.[19]

Plaintiff states that on December 22, 2011, while on suicide watch, he got "1 razor and a homemade razor from a couple inmates . . . coming out for recreation." (Doc. 15 at 8).  Plaintiff used the two razors to cut his neck and wrist, and Officer Palmer witnessed incident as he was making his 15-minute observation rounds.  (Id.; Doc. 45-1 at 12).  Palmer called for help and five officers responded.  (Doc. 45-1 at 12).  Plaintiff asserts that Officer Cooper and Defendant Corporal Crull watched him swallow the razor blades, and that Defendant Corporal Crull then sprayed him with pepper spray after he was lying on

---

[19] Although Plaintiff does not specifically allege an Eighth Amendment claim for inhumane conditions due to the lack of running water in his cell, such a claim would fail based on the facts presented.  Unsanitary conditions that are severe or prolonged may give rise to constitutional claims. Anderson v. Cnty. Of Kern, 45 F.3d 1310, 1314-15 (9th Cir. 1995).  Plaintiff has plead no facts that indicate that he was without clean water for any substantial length of time or that anyone at BCCC was aware that there was a problem with his water supply and disregarded it the issue.

the floor.  (Doc. 15 at 8; Doc. 47 at 4).  However, the
incident report, use of force report, Corporal Crull's
affidavit, and nurse's notes regarding the incident do not
support Plaintiff's claim.  (See Docs. 27-1 at 60; Doc. 45-
1 at 9-12; Doc. 44-2).  The reports detail that Officer
James responded and saw Jacoby writing on the wall with his
blood (id.), and Sergeant Lovett authorized Officer James
to use pepper spray on Plaintiff.  (Doc. 45-1 at 10).
James "sprayed inmate Jacoby [in the face, one time, for
three seconds,] and took him to medical" where he was
decontaminated.  (Doc. 45-1 at 10).  Officer Crull did
respond to the incident and was present when Jacoby was
sprayed by Officer James.  (Id.).  Once Plaintiff was taken
to medical, he was decontaminated and his wounds were
dressed.  (Doc. 27-1 at 60).  Plaintiff was transported to
the hospital and received stiches to his neck and glue on
his wrist.  (Id.).  He stated refusal of wound care from
BCCC staff "until he receives the mental health help he
needs."  (Id.).

Even if Plaintiff could prove that Defendant Crull was
the officer who sprayed him on December 22, 2011, the Court
finds there is no constitutional violation for use of
excessive force.  At the time Plaintiff was sprayed, he had
just cut himself with a secretly and illegally obtained

43

razor and was writing on the wall in his blood.  Whether
Plaintiff was jumping, standing, sitting, or lying on the
ground is irrelevant given the context.  The responding
officers had no idea if Plaintiff may have been hiding
another razor blade or dangerous instrument in his hand or
on his body; they had no insight as to Plaintiff's
intentions to harm himself or others at that point.  The
threat officers perceived was greater than the application
of force used, as Plaintiff was sprayed only one time,
taken to the medical department, and then decontaminated.
In attempt to protect Plaintiff, to protect themselves, and
to restore order, the Court finds that the use of pepper
spray against Plaintiff on December 22, 2011, was
constitutional and warranted.

**D. Retaliatory Treatment Claim.**

Plaintiff claims Defendants Byrne, Carr, and Wasdin
retaliated against him by placing him in suicide watch
after he refused to take his medications.  (Doc. 15 at 17-
18).  These are nothing more than "mere conclusionary
allegations" and are not sufficient to state a claim of
retaliation.  Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir.
1995).

> To state a valid claim for retaliation under
> section 1983, a prisoner must allege (1) a
> specific   constitutional   right,   (2)   the

44

> defendant's intent to retaliate against the
> prisoner for his or her exercise of that right,
> (3) a retaliatory adverse act, and (4) causation.
> McDonald v. Steward, 132 F.3d 225, 231 (5th Cir.
> 1998).   The inmate must allege more than his
> personal belief that he is the victim of
> retaliation.   Johnson v. Rodriguez, 110 F.3d 299,
> 310 (5th Cir.) cert. denied, 522 U.S. 995, 118
> S.Ct. 559, 139 L.Ed.2d 400 (1997).   Mere
> conclusionary allegations of retaliation will not
> be enough to withstand a proper motion for
> dismissal of the claim.   Woods v. Smith, 60 F.3d
> 1161, 1166 (5th Cir. 1995).   'The inmate must
> produce direct evidence of motivation or, the
> more probable scenario, "allege a chronology of
> events from which retaliation may plausibly be
> inferred."' Id. (citation omitted).

Jones v. Greninger, 188 F.3d 322, 324-25 (5th Cir. 1999).

"Because the mere act of classification 'does not amount to

an infliction of pain,'" the Eighth Amendment does not

prohibit inmate classification. Myron v. Terhune, 476 F.3d

716, 719 (9th Cir. 2007) (quoting Hoptowit, 682 F.2d at

1251). Consequently, Plaintiff has not raised a genuine

issue of material fact that Defendants' classification of

Plaintiff on suicide watch, constituted an Eighth Amendment

violation.   Furthermore, prisoners have no liberty

interest arising directly from the Fourteenth Amendment Due

Process clause in avoiding a transfer to more adverse

confinement conditions, Meachum v. Fano, 427 U.S. 215, 224-

25 (1976); Anderson v. County of Kern, 45 F.3d 1310, 1315

(9th Cir. 1995) ("[T]here is no liberty interest in

remaining in the general population.").

Beyond finding there is no constitutional protection for remaining in general population, the facts show that Defendants Byrne, Carr, and Wasdin were probably justified in placing, and perhaps required to place, Jacoby on suicide watch to prevent him from harming himself once he refused to take his medications.  When Defendant learned that his seizure medication had been changed and the dosage of his depression medication had been lowered, Defendant became irate and would not listen to the nurse's explanation for the changes; not only did he refuse his medications, he alluded to self-harm and threatened to harm an officer.  (Doc. 27-1 at 27, 28, 69; Doc. 45-1 at 27). The record reflects that each time, previously, Plaintiff began ranting, making demands, and refusing to take his medications, as he did on February 8, 2012, cutting incidents always followed.  (See Doc. 27-1 at 19, 40; Doc. 27-2 at 3).

Thus, there was a legitimate penological interest served by placing Plaintiff in suicide watch after he refused to take his medications.  See Turner v. Safley, 482 U.S. 78, 82 (1987).  Where a particular "restriction of pretrial detention is reasonably related to a legitimate government objective, it does not, without more, amount to 'punishment.'"  Bell v. Wolfish, 441 U.S. 520, 539 (1979).

46

Taking reasonable steps to prevent suicidal detainees from committing suicide, as the Defendants did, is a legitimate governmental purpose.  See Estate of Novack v. Cnty. Of Wood., 226 F.3d 525, 529-30 (7th Cir. 2000).  Defendants were also aware that by refusing his medications, Plaintiff was at an increased risk of having a seizure.  Had Defendants not acted out of precaution and Plaintiff had subsequently injured himself or others, Defendants would have been on notice of a substantial risk for harm and done nothing; that would have presented more liability than being proactive and providing a safe environment for Jacoby, other inmates, and the staff.  Plaintiff fails to prove any constitutional right was violated by his transfer to suicide watch and fails to prove any intent by Defendants to retaliate.  Thus, Plaintiff's retaliation claim must fail.

**E. Unlawful Depravation of Life, Liberty, and Property Claim.**

The Due Process Clause protects against deprivations of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV.  "Property interests . . . are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as

state law." <u>Bd. of Regents v. Roth</u>, 408 U.S. 564, 577 (1972).  As discussed above, prisoners have no liberty interest arising directly from the Fourteenth Amendment Due Process clause in avoiding a transfer to more adverse confinement conditions. <u>Meachum v. Fano</u>, 427 U.S. at 224-25.  However, an inmate may possess a state-created liberty interest when his confinement "imposes an atypical and significant hardship . . . in relation to the ordinary incidents of prisoner life." <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995).

To determine whether a restraint is an atypical and significant hardship, the court considers (1) differences between the challenged condition and the conditions imposed on inmates in administrative segregation and protective custody; (2) the condition's duration and the degree of restraint; and (3) whether the condition inevitably will affect the duration of the prisoner's sentence. <u>Ramirez v. Galaza</u>, 334 F.3d 850, 861 (9th Cir. 2003).  Plaintiff claims that Defendants Byrne, Carr and Wasdin denied him of clothing, bedding, and all property for "punitive reasons outside the normal policy guidelines" while he was on suicide watch for two weeks after refusing to take his medications. (Doc. 15 at 17-18).  The record shows that Plaintiff was taken to suicide watch on February 8, 2012,

and was assigned a suicide gown and a sleeping mat. (Doc. 44-6 at 14). Consistent with the holding procedures of an inmate housed on 15-minute observation, his bedding materials, clothing, and personal property were withheld due to the risk of items being used for self-injury. (Id.). One week later, on February 15, 2012, Plaintiff was changed to 30-minute observation and received his personal property back with the exception of his books and legal materials. (Doc. 43-1 at 6). Plaintiff makes no assertion that the entirety of his property was not returned to him upon his return to general population.

The Court finds no Fourteenth or Eighth Amendment violations.

> It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence . . . it may be used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer [citations omitted].

Jemison v. Haley, No. CV00-PT-2941-M, 2001 U.S. Dist. LEXIS 26670, 14 (N.D. Ala. Feb. 14, 2001). Courts consistently hold that prisons are allowed to withhold any items that could reasonably pose a suicidal risk to inmates on suicide watch. (See Carello v. Daniels, 923 F. Supp. 626, 633 (D.

49

Del. 1995) (found that stripping an inmate of all of his personal belongings, clothing, and any items the staff thought could be used to inflict harm was a reasonable response to the posed risk of suicide.); Morrison v. Martin, 755 F. Supp. 683, 687-88 (E.D.N.C. 1990) (removal of various appeals materials and Bibles from plaintiff's cell for nineteen days while he was on suicide watch did not violate the fourteenth amendment); *cf*., Gee v. Estes, 829 F.2d 1005, 1006 (10th Cir. 1987) (constitutional violation where prisoner was placed naked in a lice-infected cell, was deprived of blankets where temperature was below forty degrees, was denied food or served dirty food, and was left with his head in excrement while having a seizure).  It is a well-established principal that deference is due to correction facilities in the establishment of policies reasonably related to legitimate penological or governmental objectives. Bell v. Wolfish, 441 U.S. 520 (1979); Procunier v. Martinez, 416 U.S. 396, 404-05 (1974); Cruz v. Beto, 405 U.S. 319, 321 (1972).

The Court has already established that Plaintiff's transfer to suicide watch on February 8, 2012, was neither punitive in nature nor retaliatory. Therefore, the removal of Plaintiff's property for the brief time period he was confined to suicide watch

does not constitute a cognizable deprivation of property claim.   Accordingly, Plaintiff's allegations do not rise to the level of a constitutional violation with respect to those items temporarily removed from his cell.

<u>V.   CONCLUSION</u>

Based on the foregoing, it is recommended that the motion for summary judgment of Defendants Baldwin County, Carr, Crull, Mack, McCall, Sherman, and Wasdin be **granted**, that Plaintiff's motion for summary judgment be **denied**, and that Plaintiff's action against these Defendants be **dismissed** with prejudice.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this 7th day of May, 2013.

<u>s/BERT W. MILLING, JR.</u>
UNITED STATES MAGISTRATE JUDGE

51

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.  ***Objection***.     Any  party  who  objects  to  this
recommendation or anything in it must, within fourteen (14)
days of the date of service of this document, file specific
written objections with the Clerk of this court.   Failure
to do so will bar a de novo determination by the district
judge of anything in the recommendation and will bar an
attack,  on  appeal,  of  the  factual  findings  of  the
Magistrate Judge.   See 28 U.S.C. § 636(b)(1)(C); Lewis v.
Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v.
Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982) (en banc).
The  procedure  for  challenging  the  findings  and
recommendations of the Magistrate Judge is set out in more
detail in SD ALA LR 72.4 (June 1, 1997), which provides
that:

> A party may object to a recommendation
> entered by a magistrate judge in a
> dispositive matter, that is, a matter
> excepted by 28 U.S.C. § 636(b)(1)(A),
> by filing a 'Statement of Objection to
> Magistrate   Judge's   Recommendation'
> within ten days [20] after being served
> with a copy of the recommendation,
> unless a different time is established
> by order.   The statement of objection
> shall specify those portions of the
> recommendation to which objection is
> made and the basis for the objection.
> The objecting party shall submit to the
> district judge, at the time of filing
> the objection, a brief setting forth
> the  party's  arguments  that  the
> magistrate   judge's   recommendation
> should be reviewed de novo and a
> different disposition made.   It is
> insufficient to submit only a copy of
> the original brief submitted to the
> magistrate judge, although a copy of

---

[20] Effective December 1, 2009, the time for filing written
objections was extended to "14 days after being served with
a copy of the recommended disposition[.]" <u>Fed. R. Civ. P.</u>
72(b)(2).

the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

**2. *Transcript (applicable Where Proceedings Tape Recorded).*** Pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.